STATE OF MAINE
PENOBSCOT, SS.

DISTRICT COURT
BANGOR
CIVIL ACTION
Docket No. CV-06-3

Jay A. Smith, Inc.,
    Plaintiff

v.

Decision and Judgment

Rosco Noble et al.,
    Defendants

DON... BRECHT
LAW LIBRARY
MAY 1 3 2007

Hearing on the complaint was held on December 6, 2006. All parties were present with counsel. In this action, the plaintff, Jay A. Smith, Inc. (JAS) alleges that the defendants breached two lease contracts and that JAS then rightfully terminated the contacts, obligating the defendants to pay damages resulting from the alleged breach. For the reasons set out below, the court enters judgment for the plaintiff, but only in the amount that was due as of the date the defendants quit the premises.

JAS owns and manages a commercial building located in Brewer. The building consists of 12 units, which are leased to various businesses. The building is situated on a parcel of real property on which there are 56 marked parking spaces on pavement for use associated with the businesses in the building. In addition, there is room to park several vehicles on unpaved ground adjacent to the asphalt. Defendant Noble Enterprises, Inc. (NE) is an incorporated business that tows vehicles and performs detailing work. The principals of the corporation are defendants Rosco Noble (its president) and Dulcie Noble (its treasurer). NE acquired the towing business (Coy's Towing) from a third-party, which had operated Coy's from unit number 1 in the JAS building. After acquiring Coy's, NE maintained the same place of business. On May 7, 2003, NE entered into an independent lease agreement with JAS, under which NE rented unit 1 of JAS' building. *See* plaintiff's exhibit 1. The term of the lease was three years. NE agreed to pay monthly rent of $700 for the first eighteen months of the lease term and then $725 per month for the balance of the term. Under the terms of the lease, the monthly payments

1

were due on the first day of each month. NE also paid a security deposit of $625. Then in October 2003, NE entered into another lease agreement for unit 2, which abuts unit 1. The terms of the lease for unit 2 mirrored the first lease. Both leases provided, "Lessor hereby agrees to provide Lessee with Three (3)-parking spaces." Even by the testimony of JAS's owner, Jay Smith (Smith), the tenants in the building were not assigned particular parking spaces on the premises. Under the instruments, NE agreed not to "permit any nuisance upon the leased premises. . . ."

Over the course of time, NE's towing and detail business grew. As it did so, it generated an increasing use of parking space on the premises, and the nature of the business also involved moving vehicles from one on-site location to another. Although there is conflicting evidence, which the court evaluates below, regarding the magnitude and NE's vehicular traffic on site and its impact on other businesses that were located there, in early 2005 Smith received a complaint about the issue from at least one tenant who ran a business there, although that tenant did not complain to or even discuss the issue with either Rosco or Dulcie Noble. The Nobles did not learn until February or March 2005 that a tenant had made any complaints to Smith. NE secured the use of an area on a nearby parcel to store some of the vehicles that it otherwise would have parked on the JAS premises. Smith and Rosco Noble discussed the matter, although the number of such conversations is not revealed meaningfully in the record. (Smith could only testify that he talked to Noble about the parking issue "between one and ten times.")

In early March, Smith wrote a letter to Noble, asserting that vehicles associated with NE were blocking access to the building and that this situation constituted a safety hazard and a violation of the lease. *See* plaintiff's exhibit 4. JES' attorney then sent Noble a letter dated March 15, 2005, advising Noble that the parking problem persisted and providing thirty days notice of termination of the two units. *See* plaintiff's exhibit 5. As a result of this notice, NE sought and eventually found another location for the business. NE did not pay the April rent for either unit because of the financial pressure caused by its imminent relocation and because previously it had paid JAS security deposits for the two units. On April 19, 2005, JAS caused "Coy's Towing" to be served with a seven-day notice to quit because of the unpaid rent. NE vacated the premises by (and immediately prior to) May 7.

2

JAS has brought this action alleging that the defendants violated the lease agreements because, it contends, they did not limit their use of the parking area to six spaces (three for each of the two units) and because their parking practices amounted to a nuisance. On this basis, JAS seeks an award of compensatory damages based largely on the remaining duration of the two leases.

The preliminary question generated by the evidence and raised by the parties focuses on the proper parties to the lease agreements and to this action itself. The issue arises regarding both the plaintiff and the defendants. The defendants first argue that JAS is not a party to the lease agreement, and thus is not entitled to relief for any breach, because the signatory on the two lease instruments was Jay A. Smith, who was not identified in the document as a representative or agent of JAS. In their responsive pleadings, however, the defendants admitted JAS' allegations that JAS was a party to the lease agreement for unit 1. This admission conclusively establishes this fact. The defendants then denied the same allegations for unit 2. However, the lease agreement for unit 2 was structured identically to the lease agreement for unit 1, and the relevant language was identical between the two. Further, there is nothing to suggest that, either in reality or in the defendants' perceptions, the lessor of unit 1 was different from the lessor of unit 2. From this, the court is satisfied that JAS has proven that it was the lessor of both.

The defendants next argue that only NE was the lessee of the two units and that the two individual defendants were not parties to either lease agreement. Both lease agreements recite that all three defendants are the lessees of the units. Any remaining question about the identity of the parties to the lease for unit 1 is answered by the parties' pleadings. In answering the same allegation discussed above, the defendants' responsive pleading admits that they all were parties to the lease agreement for the rental of unit 1. This establishes that all three defendants were parties to that contract. As for unit 2, the text of the lease identified all three defendants as lessees, and the lease was executed by Rosco Noble in his representative capacity for NE and also by the two individual defendants in a personal capacity. *See generally Maine Gas & Appliances, Inc. v. Siegel*, 438 A.2d 888, 890-91 (Me. 1981) (discussion of signature forms and designations). The

3

pleadings and evidence consequently establish that all three defendants were parties to both lease agreements.

In support of its claim for breach of contract, JAS first contends that the defendants breached the leases because they used more parking spaces than the leases allowed. The relevant contractual provision is quoted above. In construing this section of the lease agreement, the court is guided by the familiar principle that any ambiguities in a contract are construed against the party that drafted it, which here is JAS. *See Champagne v. Victory Homes, Inc.*, 2006 ME 58, ¶ 8, 897 A.2d 803, 806. Further, provisions that result in a forfeiture of rights under a lease agreement are to be construed narrowly and with disfavor. *Rubin v. Josephson*, 478 A.2d 665, 669 (Me. 1984). Here, even when read in a neutral manner (much less in the way prescribed by *Champagne* and *Rubin*), the parking provisions do not impose limitations on the lessee. Rather, as the defendants correctly argue, the lease requires *the lessor* to provide three parking spaces for each unit. Because the lease imposes a floor and not a ceiling of parking space use, the defendants cannot be seen to have breached this provision of the lease.

JAS argues alternatively that NE's use of the parking area constituted a nuisance and thus a violation of the lease. Commentators have noted that the definition of a "nuisance" in Maine has proved elusive. ZILLMAN, SIMMONS AND GREGORY, MAINE TORT LAW § 14.01 (1998). In the context relevant to this case, "nuisance" would appear to mean the obstruction of a private way, or means of access and egress. *Id.*, § 14.03 This flows from the more general notion that "[a] private nuisance is a nontrespassory invasion of another's interest in the private use. . .of land." RESTATEMENT (SECOND) OF THE LAW OF TORTS (Restatement) § 821D (1979).[1] In the circumstances of this case, NE's use of the parking area rises to the level of a "nuisance" only if the invasion of the private use and enjoyment of the land is "intentional and unreasonable." Restatement at

---

[1] A public nuisance, as distinguished from a private nuisance, is "an unreasonable interference with a right common to the general public." Restatement at § 821B. The property at issue here is a private interest and is not one to which the general public has prevailing rights, as evidenced by the restrictions imposed by the lease. Examples of public uses are of highways, parks, rivers and lakes. *Id.* at § 821D, cmt. c. There is no evidence that the public has comparable rights of use and access to the parking lot on JAS' land. Thus, in the analysis set out in the text, the court is guided by principles that apply to private nuisance claims.

4

§ 822(a). Here, NE's use of the parking area as a location to store and move around its own vehicles and those of its customers is certainly intentional, because that conduct is part of the way it operates its business. To determine whether that conduct rises to the level of a "nuisance" that would be a violation of the lease, the remaining question is whether that conduct (i.e., the use of the parking area) was unreasonable.

Conduct is actionably unreasonable if "the gravity of the harm outweighs the utility of the actor's conduct. . . ." Restatement at § 826(a).[2] Here, an examination of the quality of NE's use of the parking lot must be seen in context. The building where NE leased the two units is a completely commercial space. NE's business is one that involves an appreciable volume of vehicular traffic: it needs its own commercial vehicles, such as towtrucks; it hauls and sometimes stores customer's vehicles onto the premises; and the detailing part of the business, conducted in unit 2, also makes unavoidable the presence of customer vehicles and the operation of vehicles as they are driven into and out of the bay in unit 2 where NE carried on the detailing work. JAS chose to enter into two lease agreements with knowledge of the nature of NE's business activities. Further, other businesses located at the same facility generate considerable vehicular traffic, caused by company vehicles, customer vehicles, and vehicles used by vendors. Some of this traffic causes the same type of congestion within the parking lot that JAS ascribes to NE, and in fact Smith has complained to at least one other tenant about his use of the parking lot.

The trial record contains various accounts of the amount of traffic that NE created and the effects of that traffic on others who wanted to drive into or out of the area. JAS' building is laid out such that the length of the building is oriented perpendicular to the public way (Starks Avenue). Six rental units are located on each of the long sides of the building. Units 1 and 2 (the two units that NE leased from JAS) are located at the end of the building closest to Starks Avenue. Traffic associated with the

---

[2] Conduct is also seen as unreasonable and therefore as a nuisance if "the harm caused by the conduct is serious and the financial burden of compensating for this and similar harm to others would not make the continuation of the conduct not feasible." Restatement at § 826(b). The issue raised in this case is unrelated to the need for any compensation that might be generated by NE's use of the parking lot. Thus, this alternative formulation of "unreasonableness" is not helpful here.

5

other four units on NE's side of the building therefore generally had to pass through the section of the parking lot that NE predominantly used. The evidence demonstrates clearly that there were times when passage through the parking area was blocked by NE vehicles, or vehicles under its control, or other vehicles associated with NE's business. The evidence is insufficient, however, to establish JAS' essential contention that these instances were of sufficient number and degree to rise to the level of a nuisance. As is noted above, the building is a commercial facility that is usually fully occupied by businesses. A considerable number of vehicles, coming and going, is inevitable, particularly when one considers that the nature of a number of those businesses involves vehicles. Although Smith and one tenant (the occupant of unit 4, which is on the same side of the building as units 1 and 2) testified that NE caused considerable problems with the traffic flow in the parking area, others testified that any obstructions were not significant because they did not occur frequently and because they were short in duration. When one tenant felt that another's use of the parking area was objectionable, typically the parties themselves would address and resolve the issue.[3] NE was receptive to that approach. Further, when Smith himself approached Rosco Noble about the issue, Noble promptly made alternative arrangements to secure off-site parking. He therefore was responsive to JAS' requests to reduce concerns about congestion.

Consequently, in weighing the factors that are relevant to JAS' claim that NE's use of the parking area was unreasonable, see generally Restatement at §§ 827-828, the court does not find that JAS has established this point. JAS therefore has failed to prove that any of the lessees violated the leases by using the leased premises in a way that rose to the level of a nuisance. JAS therefore was not entitled to terminate the leases.

The defendants are not liable for any losses that JAS may have sustained subsequent to the date they vacated the premises. However, the defendants remain

---

[3] Significantly, the one tenant who testified that NE's use of the parking area was unreasonable simply called on JAS to address the issue and then appeared willing to use that circumstance as a mechanism to end his lease and move elsewhere.

liable for any charges and expenses that arose prior to that date.[4] The damages JAS claims are set out in plaintiff's exhibits 9 and 10.

NE vacated the premises of the two units on or shortly prior to May 7, 2005. Despite the terms of the lease agreements, the parties, either by explicit agreement or course of conduct, treated the beginning date of a rental month as the 7th day of the month. NE did not make the April payment for either unit, instead relying on the security deposits to cover those obligations. For unit 1, the security deposit was $100 short of the rental obligation, and it was $25 short for unit 2.

NE also owes JAS $200 for its share of plowing.

After NE vacated unit 2, Smith found that the overhead door was damaged. The court attributes this damage to NE. The cost of repair was $879.49, and the defendants are liable for that expense.

JAS also seeks reimbusement for water and sewer charges. These amounts are not substantiated in the record.

And JAS finally seeks payment for property taxes. This amount is also not developed persuasively in the record, and the record also does not make clear the dates covered by the municipal taxes that JAS paid to the City of Brewer (that is, whether the taxes paid by JAS, see plaintiff's exhibit 12, are paid prior to the beginning of the tax year or in the midst of the tax year, and if so, when during the course of that period of time).

Therefore, the defendant's proven remaining liability to JAS is $1,204.49.

The lease agreements entitle JAS to an award of attorney's fees. Counsel for the plaintiff may submit an affidavit of attorney's fees with 14 days of the date of this order. Counsel for the defendants may file a response within 10 days of that filing. And

---

[4] In an affirmative defense, the defendants alleged that JAS wrongfully terminated the lease. For the reasons noted in this order, the court agrees with this contention. At commencement of trial, the defendants moved to transform that affirmative defense into a counterclaim. For the reasons stated on the record, the court denied that motion. This left the wrongful termination claim as an affirmative defense only, that is, as the basis for avoiding any liability that otherwise might be charged to them. However, the defendants presented no evidence of the amount of damages they may have sustained as the result of JAS' wrongful termination of the leases. Thus, to the extent that the defendants may be seen to have preserved such damages as a set-off or other basis to avoid an award of damages to JAS, they presented no evidence that could be used in that way.

plaintiff's counsel may file a reply within 5 days of the defendant's filing. The court will consider the issue of attorney's fees on the basis of those submissions. In doing so, the court will consider all relevant factors, including the principle that "the fee award must seem[ ] plausible, given what has transpired in the litigation, and the trial court should award only those fees that are reasonable in relation to the results achieved." *Nelson v. University of Maine System*, 944 F.Supp. 44, 48 (D. Me. 1996).

The entry shall be:

For the foregoing reasons, judgment is entered for the plaintiff and against the defendants, jointly and severally, in the amount of $1,204.49, plus pre-judgment interest at the annual rate of 7.36%, post-judgment interest at the annual rate of 10.99%, and its costs of court. Submissions on the plaintiff's claim for attorney's fees are set out in the order.

Dated: January 29, 2007

Justice, Maine Superior Court
sitting in Maine District Court

JAY A SMITH INC VS ROSCO NOBLE, DULCIE NOBLE & NOBLE ENTERPRISES INC DBA
UTN:AOCSsr  -2006-0001600                  CASE #:BANDC-CV-2006-00003
------------------------------------------------------------------------
JAY A SMITH INC                                          PL
ATTY RUSSELL, EDWARD C.   Tel# (207) 942-8244
ATTY ADDR:145 EXCHANGE STREET, SUITE 3 BANGOR ME 04401-6505

ROSCO NOBLE                                             DEF
ATTY SPAIGHT, EDWARD C.   Tel# (207) 947-6915
ATTY ADDR:23 WATER STREET PO BOX 919 BANGOR ME 04402-0919

DULCIE NOBLE                                            DEF
ATTY SPAIGHT, EDWARD C.   Tel# (207) 947-6915
ATTY ADDR:23 WATER STREET PO BOX 919 BANGOR ME 04402-0919




M=More, Space = Exit:M


Select the EXIT KEY for page selection line.